J-S46028-18

2018 PA Super 305

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| AARON M. MCCOY | : | |
| | : | |
| Appellant | : | No. 627 EDA 2017 |

Appeal from the Judgment of Sentence January 11, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000366-2016

BEFORE: BOWES, J., SHOGAN, J., and KUNSELMAN, J.

CONCURRING OPINION BY BOWES, J.: **FILED NOVEMBER 14, 2018**

I concur that the convictions for risking catastrophe and recklessly endangering another person must be vacated; however, I reach that result on different grounds than those set forth by my distinguished colleagues. As to the risking catastrophe charge, I disagree with the Majority's finding that the evidence did not establish a risk of widespread damage. The evidence on that point is somewhat contradictory, but since our standard of review for sufficiency claims gives all reasonable inferences in favor of the verdict winner, I believe that element was met. However, I agree with Appellant that the Commonwealth failed to establish that Appellant recklessly employed dangerous means capable of causing catastrophic damage. My reasoning follows.

The essential facts are straightforward. Appellant had a small marijuana growing operation in a closet located in his apartment. He used an ultraviolet

lamp, suspended in the air above the plants, to provide the necessary heat. The lamp was covered with some type of sealant. To supply electricity to the lamp, Appellant used several ordinary extension cords. The cords ran next to four open water containers, which Appellant used to mist the plants. The room was enclosed with tinfoil and contained "ordinary combustibles, which is paper and wood and it would be easily set on fire." N.T. Trial, 1/11/17, at 42. Lieutenant Charles Glover testified as an expert witness in the field of fire prevention, and opined that "with all the ignition sources in that operation and the combustibles around, there's no doubt in [my] mind that is an extreme fire hazard." *Id*. at 47.

Appellant was convicted of, *inter alia*, one count of risking a catastrophe. The statutory language for that crime reads:

> **(a) Causing catastrophe.--**A person who causes a catastrophe by explosion, fire, flood, avalanche, collapse of building, release of poison gas, radioactive material or other harmful or destructive force or substance, or by any other means of causing potentially widespread injury or damage, including selling, dealing in or otherwise providing licenses or permits to transport hazardous materials in violation of 75 Pa.C.S. Ch. 83 (relating to hazardous materials transportation), commits a felony of the first degree if he does so intentionally or knowingly, or a felony of the second degree if he does so recklessly.
>
> **(b) Risking catastrophe.--**A person is guilty of a felony of the third degree if he recklessly creates a risk of catastrophe in the employment of fire, explosives or other dangerous means listed in subsection (a) of this section.

18 Pa.C.S. § 3302.

Appellant was charged under subsection (b), and therefore the Commonwealth was required to establish that Appellant (1) recklessly created (2) a risk of catastrophe (3) through dangerous means as contemplated by subsection (a).

At the outset, I note that it is difficult to pin down exactly what the Commonwealth alleged constituted the dangerous means in this case. As our Supreme Court has held, "employment of dangerous means" does not require an inherently dangerous act. **Commonwealth v. Karetny**, 880 A.2d 505, 517 (Pa. 2005). In **Karetny**, the defendants operated a nightclub along a leased pier in Philadelphia. In 1994, portions of the pier collapsed and the damage was assessed. The defendants employed various stopgap measures over the years to repair the damage, but consistently declined costly full repairs. On May 18, 2000, the defendants were informed by an expert that the pier was in a critical state and predicted it would collapse that evening. The appellees ignored the warning and kept their business open as usual. As predicted the pier collapsed that evening, plunging the nightclub and forty-six people into the river, three of whom were killed. During pre-trial proceedings, the trial court granted a motion to quash the risking a catastrophe charge, ruling that the Commonwealth was required to prove "a particular type of an act." **Id**. at 511. The Commonwealth appealed and the Court reversed, holding that the Commonwealth presented a *prima facie* case. "[T]he totality of the aforementioned factors would support a jury in finding that appellees'

conduct and response amounted to 'employment' of a means and created the risk." *Id*. at 517.

Therefore, a broad set of behaviors and acts encompassing a course of conduct can qualify. Essentially, it is a fill-in-the-blank exercise: "Appellant created the risk of a catastrophic fire by (blank)." Consider the Commonwealth's argument, distilled to its essence: "When viewed properly, the evidence amply demonstrated that defendant risked setting a fire in a dense residential neighborhood by growing marijuana in a closet wrapped in tinfoil." Commonwealth's brief at 5. Thus, the Commonwealth identifies the dangerous means with reference to the totality of the circumstances involving the marijuana operation.

Appellant, on the other hand, argues that the expert testimony "only established a very small chance of a fire, and no evidence of a requisite risk of a catastrophe." Appellant's brief at 10. He continues:

> Lieutenant Glover had investigated between 4,500 and 5,000 fires over an eight year period of time. Over those years, of the several thousand fires he had previously investigated, he had only come "across a few of them" involving the growing of marijuana. . . . That statistic alone suggests a very small risk of growing marijuana causing a fire. Further, the very small closet growing arrangement of [Appellant] stands in sharp contrast with the few marijuana fires he had investigated in the past that, unlike this case, involved transformers and irrigation systems. Most significantly, Lieutenant Glover did not testify that any of the few marijuana grow fires he had investigated before were catastrophic, with widespread damage.
>
> The expert testimony did not support the necessary finding that if a fire had started as a result of [Appellant]'s growing of marijuana it would have posed a risk of a catastrophe, an extraordinary

disaster. Lieutenant Glover testified that if the marijuana growing was monitored and a fire started, it would be a small one that could be easily put out quickly. There was no testimony or evidence that the marijuana lamp was on when nobody was home or that the equipment was otherwise unattended.

*Id*. at 10-11 (emphasis in original).

The parties' arguments are therefore directed at different points in the causal chain. According to the Commonwealth, the legal analysis picks up after a fire has started without any discussion of the likelihood that a fire would actually start due to Appellant's employment of dangerous means. Next, if a fire started, there is a risk it will spread to other nearby homes, which would constitute a catastrophe. "[T]he word 'catastrophe' is intended to be synonymous with 'widespread injury or damage.'" ***Commonwealth v. Hughes***, 364 A.2d 306, 312 (Pa. 1976). Appellant, however, emphasizes that the risk of a fire was itself negligible, and, in any case, he notes that there was no evidence he left the operation unattended. Therefore, even if a fire started, his behavior was not reckless since he was available to extinguish it.

The Majority concludes that the grow operation "created a fire hazard, not the potential for widespread injury or damage." Majority Opinion at 10. Therefore, my colleagues appear to accept the Commonwealth's formulation that the risk of a fire is the dangerous means employed, but finds that any actual fire was incapable of causing catastrophic damage. I find that the evidence, when drawn in favor of the Commonwealth as verdict winner, establishes that catastrophic damage was possible. First, Appellant testified

- 5 -

that his landlord lived downstairs at one point, and therefore actors other than Appellant were at risk.

Q. Was anyone else living in that entire house?

A. No.

Q. What about below you, anybody living there?

A. It belonged to the landlord. He presently lived there for approximately two years.

N.T. Trial, 1/1/17, at 63. While these answers are contradictory, the fact-finder was entitled to credit the more specific answer. Additionally, the expert testified that the fire could have spread to the neighboring building, which was approximately six feet away. Accepting that a fire could have been caused by the grow operation, there was a risk of catastrophic damage.

Since the Majority limits its analysis to that point for the charge of risking a catastrophe, I now set forth my own view of why the conviction must be discharged. I agree with my colleagues that the Commonwealth established Appellant's grow operation was a fire hazard. However, I agree with Appellant that the Commonwealth failed to prove that he acted recklessly.

As our Supreme Court stated in **Hughes**, **supra**, the conduct criminalized by § 3302(b) is narrowly-defined.

> [T]he degree of culpability required by Section 3302(b) is very specific; a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. The 'risk' proscribed by this legislation is the use of dangerous means by one who 'consciously disregards a substantial and unjustifiable risk' and thereby unnecessarily exposes society to an extraordinary disaster.

*Id*. at 311.

Determining whether or not the conduct cited by the Commonwealth met that standard necessarily requires an examination of the "dangerous means" employed by the offender and how those means were "used."[1] To

---

[1] As quoted, Appellant notes that Lieutenant Glover testified that only a few of the thousands of fires he investigated resulted from marijuana growing operations. The Commonwealth asserts that point is irrelevant, because regardless of what Lieutenant Glover meant by the term few, "the frequency of fires started by home grow operations has no bearing on their potential danger after they have already ignited." Commonwealth's brief at 8-9.

This response highlights the differing views of the case. Appellant looks at the likelihood that a fire would occur, whereas the Commonwealth focuses on what would happen if a fire started. The Commonwealth's position appears to be that Appellant was *per se* reckless with respect to how his operation was established. In ***Commonwealth v. Mastromatteo***, 719 A.2d 108 (Pa.Super. 1998), we held that driving while intoxicated is not *per se* reckless. We observed:

> Our reading of the above precedent leads us to conclude that driving under the influence of intoxicating substances does not create legal recklessness *per se* but must be accompanied with other tangible indicia of unsafe driving to a degree that creates a substantial risk of injury which is consciously disregarded. Whether, in this context, the unsafe driving results from diminished judgment, a more cavalier approach to driving or sheer physical incapacitation would seem immaterial, as is the degree to which any of these factors is actually related to the consumption of alcohol or drugs. What is material is actual reckless driving or conduct, for any reason, for it is this conduct which creates the peril in question. Since people vary in their response to alcohol we believe this is a sound principle.
>
> Additionally, no statistical evidence has been proffered to support the conclusion that driving under the influence **alone** creates the degree of risk legally necessary to convict for reckless

revisit the point that the Commonwealth starts its analysis from an assumption that a fire would start, I have some difficulty with the notion that the source of a fire, *i.e.* the fact Appellant used an ultraviolet lamp with improperly graded extension cords which could have overheated and caused a fire, constitute dangerous means.[2]  However, Appellant apparently accepts

---

endangerment.

*Id*. at 1083 (emphasis in original, footnote omitted).

Appellant's point, which I find soundly stated, is that the fact the Commonwealth's expert has rarely encountered a fire stemming from the fire hazards he identified herein undercuts a finding that Appellant's operation was recklessly constructed.  As in **Mastromatteo**, the absence of statistical evidence demonstrating that Appellant's use of, *inter alia*, tinfoil and household extension cords, is a relevant consideration.

[2] The parties both focus on **what** Appellant was doing with the ultraviolet lamp and the other items, as opposed to **how** he used them.  The only relevance the marijuana itself has is Lieutenant Glover's testimony that the plants, if dried out, were more apt to burn.  The expert, however, did not visit the site and it is unknown if the plants were actually dried out.

That Appellant used questionable wiring is surely not uncommon; fifteen minutes spent watching any home renovation television show will showcase at least one instance of potentially dangerous electrical systems.  Ultraviolet lights are readily available for purchase for a wide variety of uses, and the fact that better practices exist for their use is not the same as a finding that the use of ordinary extension cords constitutes the employment of dangerous means.  The risks posed by Appellant's marijuana growing operation differ in a significant degree from, for example, the inherent dangers posed by manufacturing methamphetamine in a clandestine lab.  **See Commonwealth v. Hoke**, 928 A.2d 300, 305-06 (Pa.Super. 2007) (noting the dangers involved in home methamphetamine labs; "a simple act of throwing a light switch . . . could potentially cause the solvents in the atmosphere to ignite and/or explode") (quoting trial transcript).

this point, as discussed *supra*, and therefore for purposes of the sufficiency analysis we must do the same.

Appellant cites **Commonwealth v. Simkins**, 443 A.2d 825 (Pa.Super. 1982), as analogous to this case. Simkins was convicted of possession of amphetamine and risking a catastrophe. A fire started on Simkins's premises, which firemen quickly extinguished. While inside, they found evidence that Simkins was manufacturing amphetamine. Among other items, firemen found a fifty-five gallon drum of acetone, a volatile and highly flammable chemical. The drum had a three-inch opening stuffed with towels, and the drum was less than ten feet from an oil-fired heater. "The Commonwealth contended that appellant had risked a catastrophe because of the manner in which the acetone had been stored on the property." *Id*. at 827. The **Simkins** Court discharged that conviction, holding that the Commonwealth failed to establish recklessness.

> The Commonwealth's evidence in the instant case failed to establish that appellant's conduct in storing the acetone as described was either reckless or created a potential for an "extraordinary disaster." Rather, the Commonwealth showed a negligent storage of acetone which the Commonwealth's witness declined to testify had the potential for "widespread injury or damage." The orbit of danger, the expert said, included only appellant and the dwelling in which he had stored the acetone.
>
> . . . .
>
> In the instant case, the risk which the Commonwealth contended appellant's conduct had created was that acetone would ignite. This arose because the drum of acetone had been stored in the basement, sealed only with paper towels, in proximity to the heater. We conclude that this was insufficient to prove

recklessness. There may have been carelessness in the manner in which the acetone was stored, but the fact that it had not been used in the basement and that, while stored, the container had been closed, albeit inadequately, negatived the conclusion appellant had acted recklessly in disregard of a risk of extraordinary disaster. Moreover, the evidence failed to show that ignition of the acetone was likely to cause a catastrophe. Fire involving a single residence, unoccupied except by the actor, is not the type of widespread damage contemplated by the statutory term "catastrophe."

*Id*. at 828 (footnote omitted).

The Commonwealth responds that **Simkins** is inapposite because its expert testified that any fire in Appellant's home would have caused widespread damage, whereas in **Simkins** any ignition of the acetone would have triggered a fire that was limited in scope to the building itself. For the reasons stated *supra*, I agree that this is a pertinent distinction; the proximity of other homes established a potential for widespread damage **if** a fire started. The Commonwealth's response, however, fails to account for the other part of the quoted discussion regarding recklessness, which was Appellant's point. **Simkins** concluded that Simkins did not recklessly store the acetone, notwithstanding the potential parade of horribles if the barrel were to tip and roll into the heater. [3] Thus, the fact any fire would not have resulted in

_____

[3] In this respect, **Simkins** appears to apply concepts of foreseeability when dealing with liability premised on a potential fire. Comparably, it is possible herein that the light would have overheated, thereby causing something to catch on fire, thereby leading to other items combusting, thereby leading to catastrophic damage.

- 10 -

widespread damage was simply an alternative basis to hold that the evidence was insufficient.

I agree with Appellant that his case is similar to **Simkins**. Like that case, Appellant took preventive steps to mitigate the risk of any fire, thereby negating a finding that he consciously disregarded that risk. **See** 18 Pa.C.S. § 302(b)(3) ("A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct."). Comparable to the fact that the acetone "container had been closed, albeit inadequately," Appellant employed misters to keep the marijuana plants wet, thereby limiting the possibility identified by the expert, that the plants would dry out and catch on fire from the lamp. Additionally, there is no evidence that Appellant left the operation unattended.[4] Even if a fire started, Appellant was there to extinguish it, therefore diminishing the risk that the material element of "risking a catastrophe" existed. **Id**. Indeed, as Appellant emphasizes, the Commonwealth's expert opined that if the heat lamps are "not used correctly, they will start a fire." N.T. Trial, 1/11/17, at 38. There is little evidence that

---

[4] The Commonwealth notes that Appellant's testimony on that point was self-serving, and that the trial court was not required to accept it. That is true, but the fact the fact-finder was not required to credit his testimony does not establish that disbelief of his testimony proves the opposite. This is related to the principle that the disbelief of a defendant's testimony in a self-defense case does not, by itself, defeat a self-defense claim.

the lamps were used incorrectly, aside from the fact that Appellant used the wrong type of extension cords. The expert also noted: "And a lot of times, the problem with these, **they're left unattended, so nobody is there if a fire breaks out.**" *Id*. at 43 (emphasis added). That the operation was left unattended is not a fact proven by competent evidence, and while the Commonwealth is entitled to all reasonable inferences, it is not entitled to inferences that rely upon sheer speculation. Therefore, the Commonwealth failed to prove that Appellant's behavior was not reckless, and I concur.[5]

---

[5] My analysis of recklessness similarly disposes of the conviction for recklessly endangering another person.